IN THE OREGON TAX COURT
MAGISTRATE DIVISION
Property Tax

| | | |
|---|---|---|
| RICHARD A. KING, | ) | |
| | ) | |
| Plaintiff, | ) | TC-MD 190107G |
| | ) | |
| v. | ) | |
| | ) | |
| COLUMBIA COUNTY ASSESSOR, | ) | |
| | ) | |
| Defendant. | ) | **DECISION** |

Plaintiff appeals the 2018–19 real market value and assessed value of his home, relying

on an argument that those values should correspond to a ratio derived from other properties'

assessment data. Plaintiff appeared and testified on his own behalf. Andrea Jurkiewicz, Oregon

Registered Appraiser, appeared and testified on behalf of Defendant. Plaintiff's Exhibits 1 to 56,

79, and 80 were admitted, and Defendant's Exhibits A and B were admitted.

## I. MEASURE 50

The subject's tax roll values over the years preceding 2018–19 have been affected by

Article XI, section 11 of the Oregon Constitution, commonly known as Measure 50. Measure 50

and its implementing statutes place certain limits on property tax increases. Understanding

Measure 50's impact on the subject's tax assessment history requires understanding three

specialized terms: real market value, assessed value, and maximum assessed value.

*Real market value* is defined as "the amount in cash that could reasonably be expected to

be paid by an informed buyer to an informed seller, each acting without compulsion in an arm's-

length transaction occurring as of the assessment date for the tax year." ORS 308.205(1).[1] For

property tax purposes, a tax year runs from July 1 to June 30, and its assessment date is the

---

[1] The court's references to the Oregon Revised Statutes (ORS) are to 2017.

January 1 immediately preceding it. ORS 308.007; 308.210(1); 308.250(1). Thus, the assessment date for the 2018–19 tax year is January 1, 2018.

A property's *assessed value* is the dollar amount by which the tax rate is multiplied to determine the tax. Before the passage of Measure 50, assessed value was equal to real market value except in special cases, like farmland and forestland. Thus, properties worth more on the open market incurred a proportionately greater tax. A sharp increase in a property's real market value would result in a proportionately sharp increase in its tax burden.

Measure 50 altered that system by establishing a *maximum assessed value* for every property. Assessed value is now the lesser of a property's maximum assessed value or its real market value. ORS 308.146(2). Unless an exception applies, a property's maximum assessed value "equals 103 percent of the property's assessed value from the prior year or 100 percent of the property's maximum assessed value from the prior year, whichever is greater." ORS 308.146(1). The result is that in a rising market a property's assessed value will generally increase no more than 3 percent each year, even if its real market value increases considerably more. However, maximum assessed value does not decrease in the ordinary course. If a property's real market value decreases below its maximum assessed value, it is assessed at the lower value and its maximum assessed value does not change. If the property's real market value rises again, its assessed value will also rise up to its maximum assessed value—even if that rise is more than three percent of the previous year's assessed value.

There are exceptions requiring a recalculation of the maximum assessed value on a property account. ORS 308.146(3). The first among those exceptions applies where an account contains "new property or new improvements to property." ORS 308.146(3)(a). Another exception applies where a lot line adjustment is made; in that circumstance, the total assessed

value of the resulting properties may not exceed the total maximum assessed value of the original properties. ORS 308.146(3)(f). Both of those exceptions have applied to the subject in the course of its assessment history.

## II. STATEMENT OF FACTS

As of the assessment date on January 1, 2018, the subject consisted of a 0.31-acre lot in Scappoose improved with an 840-square-foot house and an older shop. (Ex A at 7.) The house has a "great room" living and kitchen area, two bedrooms, and two bathrooms—each of the latter with a shower, but no bathtub. Along the length of the exterior wall outside the front door runs a 6-by-42-foot covered porch on decking planks.

A.      *Assessment History*

The subject's 2018–19 tax statement shows a real market value of $252,380 and an assessed value of $207,410. (Ex 12.) Those values were a marked increase over the values on the 2014–15 tax statement for the subject's property account: a real market value of $141,970 and an assessed value of $118,430. (*See* Ex 7.) The increases in real market value and assessed value were accompanied by changes in the property account during the intervening period.

At the outset of 2014, the subject's property account—identified as Account 2970—comprised considerably less land, being listed on the roll as 0.14 acre. (Ex 79.) At that time, it was improved by the shop and a double-wide manufactured structure. (*Id.*) In November 2014, Plaintiff purchased the 0.14-acre lot together with an adjacent lot for $110,000. The lot line between the two parcels was eliminated, resulting in the 0.31-acre subject lot.

Defendant's original 2015–16 tax statement for the newly expanded account put the subject property's real market value at $190,850 and its assessed value at $151,440. (Ex 7.) The increase in the subject's maximum assessed value was the result of combining the maximum

assessed values of the two merged lots pursuant to ORS 308.146(3)(f). Because real market value exceeded maximum assessed value, assessed value was equal to maximum assessed value pursuant to ORS 308.146(2).

After receiving his 2015–16 tax statement, Plaintiff approached Defendant and requested review of the subject's tax roll values in light of his purchase price. In response, Defendant decreased both the real market value and assessed value to $125,950. (Ex 8.) Pursuant to ORS 308.146(2), the assessed value was now equal to the real market value because the real market value was lower than the maximum assessed value, which remained at the increased level set after the merger of the two lots.

Meanwhile in 2015, Plaintiff began building his 840-square-foot house, which he completed in 2016. With the house partially complete, the 2016–17 tax roll reflected increases in the subject's real market value to $182,720 and its maximum assessed value and assessed value to $173,090. (Ex 10; Ex B at 2.) After completion of the house, the 2017–18 tax roll reflected increases in the subject's real market value to $251,300 and its maximum assessed value and assessed value to $224,130. (Ex 11; Ex B at 2.) In each year, the subject's maximum assessed value had been increased from the previous year due to the presence of new property on the account and the requirement of ORS 308.146(3)(a).

In March 2017, Plaintiff sold the manufactured structure and removed it from the subject.[2] Due to that retirement, the subject's 2018–19 tax statement reflected a reduction in maximum assessed value and assessed value to $207,410, while the subject's real market value increased slightly to $252,380. (Ex 12.) Defendant reports that it derived those values as follows. First, it

---

[2] The statement in Defendant's exhibit that the manufactured structure was removed in March 2018 appears to be a typographical error. (*Cf.* Ex B at 2.) Its description of the subject's improvements as of January 1, 2018, does not include a manufactured structure. (*See* Ex A at 7.)

determined the market was rising and the subject's 2018–19 real market value with the manufactured structure had risen with it to $280,900, whereas the subject's maximum assessed value and assessed value rose three percent to $230,850. (Ex B at 2.) Defendant arrived at the tax roll values by reducing both those figures by 10.15 percent, the proportion of the real market value allocated to the manufactured structure. (*Id*. at 2–3.)

The subject's assessment history through 2018–19, the year at issue, is summarized in the following table.

| Tax Year | RMV | MAV | AV | Comment |
|---|---|---|---|---|
| 2014–15 | $141,970 | $118,430 | $118,430 | Subject comprised 0.14 acre |
| 2015–16 (original) | $190,850 | $151,440 | $151,440 | Merger with adjacent lot resulted in subject comprising 0.31 acre |
| 2015–16 (final) | $125,950 | $151,440 | $125,950 | Assessor reduced RMV based on November 2014 purchase for $110,000 |
| 2016–17 | $182,720 | $173,090 | $173,090 | New house partially completed |
| 2017–18 | $251,300 | $224,130 | $224,130 | New house completed |
| 2018–19 | $252,380 | $207,410 | $207,410 | Manufactured structure retired |

B.    *Valuation Evidence*

1.    *Plaintiff's Evidence*

Plaintiff provided an undated letter from a broker suggesting a "listing price" for the subject of $215,000. (Ex 30.) According to the letter, that suggested price was based on a comparative market analysis (CMA) that yielded "a range of possible price[s] for sale at the current time." (*Id*.) The broker wrote:

> "Comparable homes in the Scappoose area are going for an average of $261 a [square foot], list price of your house at this rate would be $219,000. I looked at your home and seeing the projects that need to be completed, quality of the home, out buildings, and area of the home [*sic*].
>
> "I suggest a listing price of $215,000. A [square-foot] price of $256."

(*Id*.)

/ / /

Plaintiff provided a spreadsheet analyzing tax roll data for recently sold properties identified by Defendant as comparable to the subject at the board of property tax appeals hearing. (Ex 29.) According to that spreadsheet, the average ratio of real-market-value-to-sale-price among those properties was 82 percent, and the average ratio of assessed-value-to-sale-price was 54 percent. (*Id*.) Plaintiff asserts that the subject's tax roll real market value and assessed value should bear a similar ratio to the price at which it would sell. Plaintiff provides two calculations: if the subject's "sold price" is taken as its current tax roll real market value—$252,380—then he would reduce its real market value to $206,951.60 and its assessed value to $136,285.20; if the subject's "sold price" is taken as the broker's suggested $215,000 listing price, he would reduce its real market value to $187,050.00 and its assessed value to $131,150.00. (*Id*.)

2.      *Defendant's Evidence*

Defendant submitted an appraisal report concluding to a value for the subject of $275,000 as of January 1, 2018. (Ex A.) Defendant's appraiser developed the sales comparison and the cost approaches for the subject after concluding that its highest and best use was as improved. (Id. at 8–12.) Under the sales comparison approach, four comparables were identified. (*Id*. at 9.) Adjustments were made for site size ($3 per square foot), gross living area ($60 per square foot), garage bays ($7,500 per bay), and for condition, all based on paired sale analyses not included with the report. (*Id*.) Adjustments for heating and cooling systems were based on Marshall & Swift data not in the report and the subject's pole building was assigned a "lump sum depreciated cost value of $4,300" by which the comparables were adjusted. (*Id*.) A $500-per-plumbing-fixture adjustment was also made. (*Id*.) No time trend was applied because "[i]mproved property market conditions showed a stable market." (*Id*. at 11.)

/ / /

Defendant's appraiser placed the most weight on a 912-square-foot bungalow on a 5,662-square-foot-lot that was built in 1940 and sold for $258,000 in cash on March 5, 2018. (Ex A at 16.) That comparable's adjusted sale price was $275,500 after a $23,520 upward adjustment for lot size and $10,000 in downward adjustments for gross living area, garage bays, and a shed. (*Id*.) Defendant's appraiser also gave weight to two cottages: one built in 1957 and measuring 816 square feet on at 4,700-square-foot lot, the other built in 1940 and measuring 880 square feet on a 5,000-square-foot lot. (*Id*. at 15.) Defendant's appraiser made upward adjustments of over $40,000 for each cottage for site size and condition, as well as smaller adjustments for living area and garage. (*Id*.) The adjusted sale prices of those two comparables were $267,800 and $268,100, respectively. (*Id*.)

Defendant's appraiser briefly summarized the cost approach as applied to the subject. (Ex A at 12.) Defendant's appraiser "deemed to use a site value of $116,000" on the basis of bare-land sales time-trended at 1.5 percent a month. (*Id*. at 12, 17.) From contacting "local developers," Defendant's appraiser determined the subject's on-site developments cost $28,000. (*Id*.) Using data from Marshall & Swift / CoreLogic, Defendant's appraiser concluded to a depreciated improvement value of $87,660. (*Id*.) The concluded value using the cost approach was $232,290. (*Id*.) However, Defendant's appraiser gave that value less weight in the final reconciliation because her cost approach "uses cost factors as they have been developed for the Portland area and have not been further refined to the Scappoose market." (*Id*. at 14.)

C.    *Relief Requested*

Plaintiff asks the court to find that the subject would sell for $215,000 and to lower its real market value and assessed value to $187,050 and $131,150, respectively. Defendant

/ / /

requests that the court uphold the 2018–19 tax roll real market value of $252,380 and assessed value of $207,410.

## III. ANALYSIS

The subject's real market value and assessed value are at issue in this case. Plaintiff raises a legal question as to how those values are related to the price for which a property would sell on the market. He also raises a factual question as to what the subject's sales price would be.

A.      *Proportionate Reduction of Assessed Value and Real Market Value*

As is discussed more fully in *Huynh v. Multnomah County Assessor*, TC–MD 190077G, 2019 WL 3546833 (Or Tax M Div Aug 5, 2019), assessed values in Oregon do not bear a uniform proportion to market values. Under Article XI, section 11 of the Oregon Constitution—commonly known as Measure 50—assessed value is the lower of a property's real market value or its maximum assessed value. Maximum assessed value does not fluctuate with the market; instead, it rises no more than three percent per year unless an exception (such as the presence of "new property or new improvements to property" on an account) applies. By isolating assessed value from market forces, Measure 50 helps taxpayers predict their annual property tax assessments. However, because there is no fixed relation between assessed value and market value, disparities in the taxation of similar properties may develop on account of each property's unique history. For that reason, Measure 50 exempts itself from our Constitution's requirement that taxation "be uniform on the same class of subjects within the territorial limits of the authority levying the tax." Or Const, Art I, § 32; *see* Or Const, Art XI, § 11(18) (exempting Measure 50 from uniformity provisions).

Because market value and assessed value bear no proportional relationship, claims based on such arguments are subject to dismissal. *See Theda v. Dept. of Rev.*, 20 OTR 237 (2010);

*Gall v. Dept. of Rev.*, 17 OTR 268 (2003). In *Theda*, the court granted dismissal where the taxpayers had argued for a reduction in assessed value "so that the relationships of [assessed value] and [real market value] for their property approximates that which they allege exists for similar properties." 20 OTR at 238.

In the present case, Plaintiff distinguishes real market value from what he terms "sales price," the latter concept denoting the price at which a property would sell on the market. Plaintiff asserts that analysis of tax roll data indicates both real market value and assessed value is typically set at a proportional fraction of "sales price." In Plaintiff's view, a property is entitled to a tax roll real market value somewhat less than the amount for which that property would sell.

In contrast, ORS 308.232 requires that every property be "valued at 100 percent of its real market value." Real market value is defined by ORS 308.205(1) as follows:

> "Real market value of all property, real and personal, means the amount in cash that could reasonably be expected to be paid by an informed buyer to an informed seller, each acting without compulsion in an arm's-length transaction occurring as of the assessment date for the tax year."

To the extent any property's tax roll real market value was less than the amount that property would have sold for on the relevant assessment date according the criteria of ORS 308.205(1), that property's tax roll real market value is incorrect.[3] Plaintiff's ratio-based argument for reducing real market value does not succeed.

Plaintiff's argument for deriving the subject's assessed value from a ratio of similar properties' assessed values to market values is indistinguishable from the argument of the

---

[3] The real market values of the comparable properties analyzed by Plaintiff are not at issue here, but the data in evidence do not establish they are incorrect. The terms of the sales are unverified, and numerous factors could contribute to a gap between sale price and tax roll real market value, including pre-sale repair work not reflected on the prior year's tax roll and a market rising between the assessment and sales dates.

taxpayers in *Theda* and likewise fails. *See* 20 OTR at 238. Given the string of exception events in the subject's assessment history—including a lot line adjustment, two years of new construction, and a retirement—it is unsurprising that the subject's maximum assessed value should have grown faster than the maximum assessed values of other properties. Each exception event triggered a recalculation of maximum assessed value under Measure 50. Nothing in evidence suggests those recalculations were performed incorrectly. The subject's assessment appears to be a consequence of Measure 50, which foresees and allows nonuniform assessment of similar properties. *See* Or Const, Art XI, § 11(18).

B.      *Uniformity*

Although maximum assessed value is excused from uniformity by Measure 50, real market value was not created by Measure 50 and must still satisfy Article I, section 32 of the Oregon Constitution. *Deschutes County Assessor v. Leszar*, TC–MD 170099N, 2018 WL 334450 at *7 (Or Tax M Div Jan 9, 2018). To prove a property's real market value is affected by a uniformity violation, a taxpayer must show either that the property's classification lacks a rational basis or that there is "widespread and systematic" nonuniformity within the property's class. *See id.* at *7–*9.

Although Plaintiff stated at a case management conference that he intended to develop a uniformity claim, he did not ultimately introduce evidence supporting such a claim. There is no evidence comparing the subject to other properties within its class, and no evidence suggesting the subject's property classification lacks a rational basis. Countywide spreadsheet data provided by Plaintiff does not distinguish properties by class, and includes a wide array of construction years, sale prices, and acreage. Plaintiff has not made out a uniformity claim.

/ / /

C.    *Real Market Value*

Apart from his legal theory about proportional assessment, Plaintiff raises a factual question of the subject's 2018–19 real market value. On such factual questions, the party seeking affirmative relief from the court must bear the burden of proof. ORS 305.427.

Any method used to determine real market value for tax purposes must accord with rules adopted by the Department of Revenue. ORS 308.205(2). In pertinent part, the Department of Revenue's rule governing use of the sales comparison approach states:

> "In utilizing the sales comparison approach, only actual market transactions of property comparable to the subject, or adjusted to be comparable, may be used. All transactions utilized in the sales comparison approach must be verified to ensure they reflect arms-length market transactions. When non-typical market conditions of sale are involved in a transaction (duress, death, foreclosures, interrelated corporations or persons, etc.), the transaction may not be used in the sales comparison approach unless market-based adjustments can be made for the non-typical market condition."

OAR 150-308-0240(2)(c).

Here, Plaintiff's primary evidence of real market value is the letter from the broker. However, that letter does not show that Plaintiff's broker valued the subject in accord with OAR 150-308-0240(2)(c). The letter relies on values taken from a listing service rather than verified market transactions and on values taken from properties in the Scappoose area generally rather than from comparable properties. Because Plaintiff's broker did not testify at trial, the contents of his letter are hearsay; no one is responsible under oath for the truth of that letter's conclusions. Relatedly, it was not possible to question the broker about ambiguities in the letter, such as the relation between listing price and real market value and the date of the valuation. Plaintiff has not borne his burden of showing a lower real market value for the subject property.

/ / /

/ / /

Defendant's evidence of value consists of its appraiser's report and testimony. Although Defendant's appraiser concluded to a real market value higher than that on the tax roll for the subject, Defendant reiterated after trial that it sought only to uphold the tax roll values.

The court has authority to determine real market value based on the evidence, without regard to the pleaded values. ORS 305.412. According to a practice antedating the enactment of ORS 305.412, the court may decline to find values outside the range within the parties' pleaded values. *Chart Development Corp. v. Dept. of Rev.*, 16 OTR 9, 14–15 (2001); *but see Ellison v. Dept. of Rev.*, 362 Or 527, 529, 412 P3d 201 (2018) (declining to rule on whether ORS 305.412 abrogated *Chart Development* because Tax Court had not ruled in first instance); *cf. Covington v. Dept. of Rev.*, TC 5370, 2020 WL 1033578 at *2 (Or Tax Reg Div Mar 3, 2020) (commenting that court may limit value determination based on parties' agreement). In the present case, the court limits the potential values under consideration to the range within the values pleaded by the parties. *See Chart Development*, 16 OTR at 14–15. The court will not raise the subject's tax roll real market value because, even apart from the merits of Defendant's appraisal report, neither party requests it.

The court would reduce the subject's value if the evidence supported such a reduction. However, the best valuation evidence available is Defendant's appraisal report, which concludes to a real market value higher than that on the tax roll. While an appraisal report might contain data that warranted finding a value other than that to which the report concluded, such is not the case here. Indeed, the probative value of Defendant's appraisal report is diminished by its conclusory form. Although Defendant's appraiser based many adjustments on paired-sales analyses and other pertinent market data, the report does not contain that supporting information. Other adjustments are presented without reference to supporting data. Notably, the report asserts a stable market—and no time trend—for improved properties at the same time it asserts a time

trend for bare land amounting to 18 percent annually. The data included with the report are not sufficient to support a determination of real market value less than the tax roll value of $252,380.[4]

## IV. CONCLUSION

Plaintiff's arguments for proportionate reduction of real market value and assessed value are without foundation in law. He has not established the elements of a uniformity claim and he has not carried his burden of proving a lower real market value for the subject. Now, therefore,

IT IS THE DECISION OF THIS COURT that Plaintiff's appeal be and hereby is denied.

Dated this _____ day of September 2020.

POUL F. LUNDGREN
MAGISTRATE

*If you want to appeal this Decision, file a complaint in the Regular Division of the Oregon Tax Court, by __mailing__ to: 1163 State Street, Salem, OR 97301-2563; or by __hand delivery__ to: Fourth Floor, 1241 State Street, Salem, OR.*

*Your complaint must be submitted within __60__ days after the date of this Decision or this Decision cannot be changed. TCR-MD 19 B.*

*Some appeal deadlines were extended in response to the Covid-19 emergency. Additional information is available at __https://www.courts.oregon.gov/courts/tax.__*

*This document was signed by Magistrate Poul F. Lundgren and entered on September 16, 2020.*

---

[4] Plaintiff challenges Defendant's valuation by challenging the accuracy of the appraisal card maintained by Defendant for the subject. Plaintiff alleges errors amounting to a $15,000 valuation error, including the subject's room count, the quality and quantity of the fixtures, and the classification of the carpentry outside the subject's door as a "covered deck" as opposed to a "front porch." Plaintiff's challenge misses the mark because the tax roll is not a starting point for calculating value in this court and Defendant's appraisal report does not purport to rely on the appraisal card. Even if $15,000 were removed from the Defendant's $275,000 value conclusion, the resulting value would exceed the tax roll value.